# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 3779 | DATE | 11/4/2003 |
| CASE TITLE | Lyons vs. Premium Armored Service | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Status hearing held. For the reasons stated in the attached memorandum opinion and order, defendant's motion for summary judgment [19-1] is denied. Enter Memorandum Opinion and Order. Pretrial order deadline is 11/19/03.

(11) ■ [For further detail see order attached to the original minute order.]

|   | No notices required, advised in open court. | | 2 number of notices | Document Number |
|---|---|---|---|---|
|   | No notices required. | | | |
| X | Notices mailed by judge's staff. | | NOV 5 2003 date docketed | |
|   | Notified counsel by telephone. | | | |
|   | Docketing to mail notices. | | | 29 |
|   | Mail AO 450 form. | | docketing deputy initials | |
|   | Copy to judge/magistrate judge. | | 11/4/03 date mailed notice | |
| MF | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

| | |
|---|---|
| SARA JEAN LYONS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 02 C 3779 |
| v. ) | |
| ) | Judge John W. Darrah |
| PREMIUM ARMORED SERVICES, INC. ) | |
| ) | |
| Defendant. ) | |

DOCKETED NOV - 5 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff, Sara Jean Lyons, filed a complaint against Defendant, Premium Armored Services, Inc., alleging discrimination (Count I) in violation of Title VII by terminating her employment due to her pregnancy and retaliatory discharge (Count II) for terminating her employment because her husband filed a workers' compensation claim. Subsequently, this Court granted Defendant's Motion to Dismiss Count II. Presently before the Court is Defendant's Motion for Summary Judgment.

### BACKGROUND

Premium is an armored car service that provides cash replenishment and maintenance services for automated teller machines. (Def.'s 56.1(a)(3) Statement ¶ 1). Plaintiff was referred to Premium by her husband, Phil Lyons, who is also employed at Premium. (Id., ¶ 3).

Plaintiff began working for Premium on October 23, 2000. Plaintiff was hired to provide general reception duties at one of Premium's branch facilities. Plaintiff's job duties included answering the telephone, distributing papers to the appropriate people, collecting and delivering the mail on a daily basis, processing ingoing and outgoing United Parcel Services ("UPS") shipments, and periodically checking and distributing faxes. (Def.'d 56.1(a)(3) Statement ¶ 4).

29

When Plaintiff began working at Premium, she reported to Cliff Schau and Kathy Gnoffo. (Def.'s 56.1(a)(3) Statement ¶ 5). Schau was a Regional Branch Manager for the region that included Plaintiff's branch. (Id., ¶ 6). Gnoffo was Premium's Compliance Manager. As the Compliance Manager, Gnoffo set and enforced the vault and cash procedures throughout all of Premium's branches. (Id., ¶ 7). Mary Borfitz was the Vice President of Human Resources for Premium during Plaintiff's employment. (Id., ¶ 8).

Borfitz confirmed Premium's offer of employment to Plaintiff in a letter dated September 29, 2000. Along with the letter, Premium shipped a copy of its Employee Manual. (Def.'s 56.1(a)(3) Statement ¶ 9). Plaintiff received the Employee Manual and signed an acknowledgment form to that effect on October 8, 2000. In that acknowledgment form, Plaintiff indicated that: "I have received and am responsible to read the copy of the Premium Armored Services Employee Manual dated March 31, 1997." (Id., ¶ 10). Premium's Employee Manual contained the following non-discrimination clause:

> The only things we require of you are performance and good team attitude; however, employment at Premium Armored Services is "at will". No one will be denied opportunities or benefits on the basis of age, sex, color, race, creed, national origin, religious persuasion, marital status, political belief, or disability that does not prohibit performance of essence job functions; nor will anyone receive special treatment for those reasons.

(Id., ¶ 11).

Premium employees did not begin to accrue sick leave or vacation time until after ninety days of employment. (Def.'s 56.1(a)(3) Statement ¶ 12). Premium's Employee Manual provides:

> Excessive Absenteeism or Lateness
>
> > In general, two (2) absences in a 90-day period, or a consistent pattern of absence, will be considered excessive, and the reasons for the absences may come under question.
> >
> > * * *
> >
> > Be aware that excessive absenteeism, lateness or leaving early may lead to disciplinary action, including possible dismissal.

(Id., ¶ 13). The Employee Manual also contains written policies against employees using its mail, property, facilities or services for personal purposes. The Employee manual provides:

> Personal Phone Calls & Mail
>
> * * *
>
> Do not use Premium Armored Services as a personal mailing address, and do not put personal mail in the stacks that are to be run through the postage meter. Although the amount may seem small, it is still considered theft.
>
> Theft
>
> Property theft of any type will not be tolerated by Premium Armored Services. We consider property theft to be the unauthorized use of company services or facilities or the taking of any company property for personal use.

(Id., ¶ 14). Premium's handbook also provides that unsatisfactory or careless work may be subject to disciplinary action, including immediate dismissal. (Id., ¶ 15). The Employee Manual also provides that no one, other than the Chief Executive Officer of Premium, may alter or modify any of the policies in the manual and that no statement by a supervisor or manager may be interpreted as a change in policy nor will it constitute an agreement with an employee. (Id., ¶ 16).

In December 2000, Plaintiff had a meeting with Borfitz. At that time, Borfitz discussed with Plaintiff the four-and-one-half days that Plaintiff had been absent to date. (Def.'s 56.1(a)(3)

3

Statement ¶ 48). At the meeting, Plaintiff was concerned about how her absences were reflecting on her employment. Plaintiff indicated that she "thought excused days off were not considered absenteeism in [her] prior experience." Plaintiff had not realized that the absences were considered absentee days. (Id., ¶ 49).

Schau also had contacted Borfitz to request that Plaintiff be counseled for her absences. In response to Borfitz's request, Schau created a list of the fifteen dates that Plaintiff had missed up to that time and forwarded the list on February 20, 2001. (Def.'s 56.1(a)(3) Statement ¶ 51).

During the first ninety days of Plaintiff's employment, Gnoffo also talked to Schau and Borfitz about Plaintiff's absences. Gnoffo told Schau and Borfitz that Plaintiff's absences were excessive and that such absences were causing problems in the branch. (Def.'s 56.1(a)(3) Statement ¶ 52). Plaintiff has identified sixteen absences as follows: October 30, 2000 - grandfather sick; October 31, 2000 - grandfather sick; November 1, 2000 - grandfather sick; November 24, 2000 - doctor appointment; November 30, 2000 - ultrasound appointment; December 18, 2000 - son sick; December 19, 2000 - son sick; December 26, 2000 - son sick; January 10, 2001 - Plaintiff sick; January 11, 2001 - Plaintiff sick; January 12, 2001 - Plaintiff sick; January 15, 2001 - Plaintiff sick; February 12, 2001 - grandfather sick; February 19, 2001 - husband sick; February 20, 2001 - husband sick; and February 23, 2001 - house closing. Ten of the sixteen absences had nothing to do with Plaintiff's pregnancy. (Id., ¶ 53).

Premium's Chief Executive Officer, Mark Hoppe, set a policy that no employee could use Premium's overnight courier accounts for personal use without first seeking permission from him. He informed Premium's supervisory and management personnel, the accounting department, and other employees of that policy throughout the company's existence. It was Hoppe's practice, during

the period of Plaintiff's employment, to review invoices sent to Premium by its vendors, including UPS. (Def.'s 56.1(a)(3) Statement ¶ 21). In Hoppe's review of UPS invoices during February 2001, he discovered three shipments that did not appear to be connected with any of Premium's vendors or customers. Three shipments were sent to a "BLF" in Riverdale, Maryland. The destination made him suspicious because Premium does not do business in Maryland; he believed initials were used to mask the fact that the shipments were sent to an individual as opposed to a corporate customer and because the packages were sent just before Christmas. (Id., ¶ 22).

On or about February 25, 2001, Hoppe spoke with Borfitz about the three shipments. Hoppe requested that Borfitz find out who had sent and received the packages. If the three packages were sent for personal reasons, it was Hoppe's desire that the offending party's employment be terminated. At that time, Hoppe did not know who sent the shipments. (Def.'s 56.1(a)(3) Statement ¶ 23).

In addition to contacting Borfitz, Hoppe contacted Premium Manager, Katherine Moberg, to ask her if she could identify the Maryland addressee. Moberg enlisted Gnoffo to help, and they unsuccessfully attempted to access the UPS tracking system via Plaintiff's computer. Moberg and Gnoffo then inspected the UPS files maintained by Plaintiff in a file drawer and found documentation for the Maryland shipments, along with other UPS documentation and one of Plaintiff's personal checks. (Def.'s 56.1(a)(3) Statement ¶ 24). Borfitz performed a search in the employee database and matched the Maryland address with Plaintiff's emergency contact information. Borfitz then contacted Gnoffo "to talk about ... what had just been discovered; and, at that point, it was agreed that Sara would be released ... [b]ecause of misuse of company property and services." It did not matter if Plaintiff had attempted at some point to tender payment for the UPS services because Plaintiff did not have authorization from Hoppe to use the services. (Id., ¶ 25).

On February 26, 2001, Plaintiff's employment with Premium was terminated. On that day, Plaintiff was called into Gnoffo's office. Borfitz was also present in Gnoffo's office. (Def.'s 56.1(a)(3) Statement ¶ 28). Borfitz advised Plaintiff that they had discovered that she had been using company equipment and services for personal use and decided to release her because of such use. Plaintiff became "tearful" and indicated that she had paid for the services. Plaintiff went to another room, opened a drawer, and returned with a sheet of paper from UPS indicating the cost of the shipment and a personal check attached to it. (Id., ¶ 28). The check and invoice was unrelated to any of the three Maryland packages that Hoppe had discovered. Rather, the package was sent on October 25, 2000, to Plaintiff's husband's attorney. (Id., ¶ 29).

Borfitz also informed Plaintiff that she had excessive absences from work and that there had been work performance issues. Plaintiff's attendance was an issue because of the number of days she missed in a short period of time. Borfitz also explained that there had been problems with route summaries, load sheets, and an "Oklahoma audit". (Def.'s 56.1(a)(3) Statement ¶ 30). Pregnancy was never discussed between Plaintiff and anyone else at Premium on the date of her termination. (Id., ¶ 31).

On the day that Plaintiff was terminated, Borfitz created and placed a memo in Plaintiff's file. The memo stated that Plaintiff's employment was terminated due to excessive absenteeism, poor quality of work, and personal use of company-paid shipping. (Def.'s 56.1(a)(3) Statement ¶ 32). After Plaintiff's termination, Plaintiff's job responsibilities were transferred to an existing employee, Vicky Smith. (Id., ¶ 34).

Plaintiff used Premium's UPS account number to send her packages. (Def.'s 56.1(a)(3) Statement ¶ 35). A total of five packages were sent by Plaintiff. The dates of the shipments were

October 25, 2000; December 5, 2000; December 20, 2000; December 22, 2000; and December 27, 2000. (Id., ¶ 39). Plaintiff claims that her personal use of the UPS account was authorized in each instance by Schau. To obtain such permission, Plaintiff would have "physically walked into his office and asked him." (Id., ¶ 41). Plaintiff does not recall sending a personal package on December 5, 2000. However, if she did, she would not have sent the package without first walking in and asking Schau's permission. (Id., ¶ 38). The week of December 5, 2000, Schau was out of the office. (Id., ¶ 41). Schau has no recollection of Plaintiff's ever asking him for permission to use the UPS account for personal reasons; and he had never given authorization to anyone at Premium, including Plaintiff, to use the UPS account for personal reasons because he does not have authority to do so. (Id., ¶ 42).

Plaintiff was also terminated for performance-related reasons. (Def.'s 56.1(a)(3) Statement ¶ 57). One of Plaintiff's performance-related problems included inaccuracies in her work. Plaintiff's supervisors did not feel that Plaintiff's follow-up was good. There were simple tasks that Plaintiff was assigned that she was not performing; some of these were costing Premium money, such as inaccurate preparation of vault logs. (Id., ¶ 57). Borfitz knew that Schau was frustrated with Plaintiff's performance. Schau had discussed Plaintiff's unsatisfactory work performance with Borfitz during the first ninety days of Plaintiff's employment. Schau also discussed his concerns about the inadequacies in Plaintiff's work with Gnoffo during Plaintiff's fourth month at Premium. (Id., ¶ 58). At one time, Schau assigned a zip code project to Plaintiff, in which she was to fill in zip codes on a spread sheet. Because the project was not completed as promised, Schau took the project away from Plaintiff and completed it himself. (Id., ¶ 59). Other projects were assigned to Plaintiff by Schau and were completed. However, many were completed incorrectly and with errors. (Id.,

7

¶ 60). Plaintiff recalls noticing that Schau gave her less work and that tasks assigned by Schau became minimal. (Id., ¶ 61).

Gnoffo also had problems with Plaintiff's work, including failing to properly distribute work documents and failing to deliver customer faxes when they arrived. Gnoffo discussed the fax problem with Plaintiff at least three times, and Schau also discussed it with the Plaintiff. (Def.'s 56.1(a)(3) Statement ¶¶ 62-63). Plaintiff recalls being asked to check for faxes. (Id., ¶ 64). Prior to Plaintiff's termination, Schau had several discussions with Gnoffo regarding Gnoffo's lack of satisfaction with special projects that had been given to Plaintiff. (Id., ¶ 65).

Premium became aware of Plaintiff's pregnancy on November 13, 2000. (Def.'s 56.1(a)(3) Statement ¶ 72). During her tenure at Premium, Plaintiff believed that Borfitz began treating the news of her pregnancy as if she was not happy for Plaintiff. Plaintiff held this belief because Borfitz would frequently ask Plaintiff about her pregnancy, including how the pregnancy was going, was she having complications, and was she returning to work after the baby was born. (Id., ¶ 73).

At their depositions, Gnoffo and Borfitz testified that the unauthorized use of Premium's UPS account was the only thing discussed with Plaintiff the day that she was terminated. (Plaint.'s 56.1(b)(3) Statement ¶¶ 2-3). In response to Plaintiff's claim for unemployment compensation, Borfitz indicated on a form that Plaintiff was terminated for absenteeism and poor work performance. (Id, ¶ 5). In its response to Plaintiff's EEOC charge, Premium identified Plaintiff's poor work performance, excess absenteeism, and unauthorized use of the UPS account as the reasons for her termination. (Id., ¶ 11). Plaintiff did not receive any written warnings concerning her absenteeism or poor work performance, and she successfully completed her ninety-day probationary period. (Id., ¶¶ 14-23).

8

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Discrimination on the basis of pregnancy is unlawful under Title VII as amended by the Pregnancy Discrimination Act. *See* 42 U.S.C. § 2000e-2(k); *Gleason v. Mesirow Fin., Inc.* 118 F.3d 1134, 1139 (7th Cir. 1997) (*Gleason*). Title VII, as amended by the Pregnancy Discrimination Act, protects a woman from being fired because of her pregnancy. However, it does not protect a pregnant woman from being fired without good cause. *See Gleason*, 118 F.3d at 1139.

There are two methods for a plaintiff to establish pregnancy discrimination: (1) evidence of intentional discrimination and (2) the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Maldonado v. U.S. Bank*, 186 F.3d 759, 763 (7th Cir. 1999) (*Maldonado*).[1]

Evidence of an intentional discrimination can be either direct or circumstantial. Direct

---

[1] Plaintiff does not argue that she has established pregnancy discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Instead, she argues that she has established pregnancy discrimination via evidence of intentional discrimination.

9

evidence of discrimination consists of an admission by the decision-maker that his or her actions were taken because of Plaintiff's pregnancy. *See Maldonado*, 186 F.3d at 763. Circumstantial evidence of intentional discrimination can be demonstrated by any of the following or a combination of the following: (1) suspicious timing, oral or written ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other evidence from which an inference of discriminatory intent can be drawn; (2) evidence that the employer systematically treated other similarly situated, non-pregnant employees better; or (3) evidence that the plaintiff was qualified for the position but passed over in favor of a person not having the forbidden characteristic and that the employer's stated reason for its decision is "unworthy of belief, a mere pretext for discrimination". *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

Here, Plaintiff does not present any direct evidence of discrimination, *i.e.*, an admission by the decision-maker that his or her actions were taken because of Plaintiff's pregnancy. Instead, Plaintiff attempts to present circumstantial evidence to demonstrate that she was terminated because of her pregnancy.

Plaintiff contends that an inference of discriminatory intent can be drawn from Borfitz's statements to her concerning her pregnancy and Defendant's differing reasons for her termination at different times.

Plaintiff testified at her deposition that Borfitz would frequently ask Plaintiff about her pregnancy, including how the pregnancy was going, was she having complications, and was she returning to work after the baby was born. Borfitz denied that most of these conversations took place. Furthermore, at the time of Plaintiff's termination, Defendant informed Plaintiff that she was being terminated because of excessive absenteeism, poor work performance, and unauthorized use

of the UPS account. However, at their deposition, Borfitz and Gnoffo testified that Plaintiff's unauthorized use of the UPS account was the reason for Plaintiff's termination. Later, Borfitz completed a response to Plaintiff's claim for state unemployment in which the stated reasons for Plaintiff's termination was excessive absenteeism and poor work performance. In the present motion, Defendant describes the failure to include the unauthorized use of the UPS account in response to Plaintiff's claim for state unemployment as an "oversight". In response to Plaintiff's EEOC charge, Defendant's asserted that Plaintiff was terminated because of excessive absenteeism, poor work performance, and unauthorized use of the UPS account.

Viewing the contested statements of Borfitz concerning Plaintiff's pregnancy and Defendant's differing explanations for Plaintiff's termination and the reasonable inferences that may be drawn from such evidence in the light most favorable to the Plaintiff, Plaintiff has demonstrated that a genuine issue of material fact exists as to whether Plaintiff was terminated, at least in part, because of her pregnancy. *See Zaccagnini v. Cas. Levy Circulating Co.*, 338 F.3d 672, 676-77 (7th Cir. 2003) (differing reasons for termination precluded summary judgment); *Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995) ("Because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment.").

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is denied.

Dated: December 4, 2003

JOHN W. DARRAH
United States District Judge

11